IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

EOD

07/26/2019

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **WILLIAM GARY STAPLETON** | § | Case No. 14-42478 |
| xxx-xx-1161 | § | |
| 1161 Stacy Rd., Fairview, TX 75069 | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| BENCHMARK BANK | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 16-4083 |
| | § | |
| WILLIAM GARY STAPLETON | § | |
| | § | |
| Defendant | § | **[superseding dkt #15]** |

**AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**[1]

Upon trial of the portion of the complaint filed by the Plaintiff, Benchmark Bank, seeking a determination that the indebtedness owed to it by the Debtor-Defendant, William Gary Stapleton, should be declared nondischargeable pursuant to 11 U.S.C § 523(a)(2)(B), the Court issues the following findings of fact and conclusions of law. This memorandum disposes of all issues pending before the Court.

**FINDINGS OF FACT**

1.  In mid-2006, the Debtor-Defendant, William Gary Stapleton (the "Defendant") was the successful owner of certain business enterprises, including ventures

---

[1] These findings of fact and conclusions of law are not designated for publication and shall not be considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other applicable evidentiary doctrines. The Amended Findings merely delete sentence fragments which were inadvertently included in the original findings.

involving oil and gas exploration and production and real estate investment.

2.  In financing his various enterprises, the Defendant enjoyed a mutually beneficial, ongoing business relationship at that time with the Plaintiff, Benchmark Bank (the "Bank").

3.  The Bank had previously provided financing for various types of business and personal projects for the Defendant and his companies.

4.  The Defendant had a history of successfully performing his loan obligations and satisfying large amounts of indebtedness to the Bank.

5.  At that time, the Defendant had a significant social relationship with the Bank's president, often involving their families or luxury trips, and the Defendant was generally viewed as a successful client of the Bank.

6.  It was the Defendant's customary practice, particularly involving acquisition of assets for personal use, to seek short-term loans from the Bank, usually accompanied by a 20% down payment.

7.  Prior to the transaction in question in this case, the Defendant had repeatedly acquired financing from the Bank to purchase, for example, a 2005 Porsche (March 2005), a 2006 Bentley (December 2005), and a 2006 Lamborghini (March 2006).

8.  In June 2006, the Defendant contacted the Bank regarding the procurement of a loan for approximately $672,000.00 for the purchase of a 2005 50' Sea Ray boat from a dealership located on Lake Lewisville for a purchase price of $750,000.00 (the "Boat Loan").

9.  It is uncontradicted that the Defendant initially telephoned a Bank representative, a Mr. Jason Bean, to inquire about incurring that indebtedness for the purchase of the boat, to be accompanied by his usual 20% down payment, and Bean directed the Defendant to transmit the boat specification sheet to the Bank for review and processing.

10. Despite its size, the Defendant was not required to tender a loan application to the Bank with regard to the Boat Loan.

11. The Defendant tendered the required information about the boat as requested by his loan officer and he was subsequently informed a few days later that the loan

-2-

committee had approved the Boat Loan.

12.   It is uncontradicted that the Defendant only visited the Bank on one occasion — on July 7, 2006 —  in order to sign the loan documents and to tender to the Bank the 20% down payment of approximately $150,000.

13.   On that date, the Defendant executed a promissory note in the original amount of $672,000.00 for the purchase of the boat.[2]

14.   The Defendant also granted to the Bank a preferred mortgage against the purchased boat, known as the CAMTAY, as well as against other assets to secure payment of the promissory note.[3]

15.   After a period of two or more years, the Defendant subsequently failed to pay the Plaintiff as agreed and defaulted under the terms of the promissory note and the preferred mortgage.[4]

16.   The Bank became a judgment creditor of the Debtor-Defendant in the sum of $258,723.06 arising from the entry of a final judgment in its favor on October 24, 2014 in litigation conducted before the United States District Court for the Eastern District of Texas, Sherman Division, in civil action no. 4:13-cv-00247 and styled *Benchmark Bank v. CAMTAY, Official No. 1189482, in rem, and William G. Stapleton, in personam* (the "Federal Court Judgment").[5]

17.   One month later, on November 26, 2014, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against the Defendant in this Court by Starfish Investments, L.P. under case number 14-42478.[6]

18.   The Defendant filed an answer to the involuntary petition on December 22, 2014.

19.   On January 14, 2015, the Defendant consented to the entry of an order for relief

---

[2] Ex. 5.  *See also* ¶¶ 1 and 2 of the Statement of Stipulated Facts set forth in the approved Joint Pre-Trial Order entered in this adversary proceeding on January 28, 2019.

[3] Ex. 6.  *See also* Statement of Stipulated Facts at ¶ 3.

[4]   ¶ 4 of the Stipulated Statements of Fact.

[5] *Id.* at ¶ 5.

[6] *Id.* at ¶ 6.

under Chapter 7 of the Bankruptcy Code through an agreed order.[7]

20.     On June 11, 2015, the Bank filed its complaint against the Defendant under
        adversary proceeding no. 15-4050, presenting an objection to the entry of a general
        discharge order to the Defendant under § 727 of the Bankruptcy Code, as well as
        an alternative count seeking the determination of the dischargeability of a
        particular debt under 11 U.S.C. § 523(a)(2)(B) pertaining to the dischargeability of
        the judgment amount arising from the Federal Court Judgment.

21.     Due to the pendency of multiple § 727 complaints against the Defendant objecting
        to the entry of a general discharge order in his favor, the Court entered its
        *Amended Sua Sponte Order Severing Counts of Complaint into Separate
        Adversary Proceedings and Abating Adversary Regarding Count II of Complaint*
        on August 24, 2016 **[dkt #24 in adv. proc. no. 15-4050]** which severed the Bank's
        § 523(a)(2)(B) complaint into the present adversary proceeding and stayed the
        prosecution of that claim pending the determination of the § 727 actions.

22.     The Court dissolved its abatement of this adversary proceeding on August 16,
        2018 after resolutions of the § 727 actions were reached without resulting in a
        denial of the Debtor-Defendant's discharge.

23.     The Bank contends that the judgment amount arising from the Federal Court
        Judgment should be declared nondischargeable as a debt obtained through the
        alleged submission of a false financial statement by the Defendant.

24.     According to the Bank, the Defendant submitted a written financial statement in
        June 2006 in his effort to procure the Boat Loan which he allegedly omitted a
        personal liability of $295,000 which the Defendant personally owed to Stapleton
        Enterprises, Inc.

25.     The Defendant vigorously denies that he ever submitted a financial statement of
        any kind to the Bank to procure the Boat Loan.

26.     The Bank relies upon the testimony of its current Vice-President for Loan
        Operations, Mr. James A. Neuhoff.

27.     Mr. Neuhoff admittedly was not an employee of the Bank at the time of the
        transaction in 2006 in which approval of the Boat Loan was being contemplated by

---

[7]   ¶ 7 of the Stipulated Statements of Fact.  *See also* dkt #10 in Case No. 14-42478.  The
Defendant's spouse was not joined in the bankruptcy case.

the Bank.

28.  Thus, Mr. Neuhoff has no personal knowledge about the actions of the Defendant in seeking approval of the Boat Loan.[8]

29.  Mr. Neuhoff was not involved in the loan approval process at issue in this case and has no personal knowledge about the documentation solicited by the Bank with regard to the Boat Loan or about any of the actions or omissions by Bank personnel during the process leading to the approval of the Boat Loan.

30.  Mr. Neuhoff testified as to what documentation exists in the Bank's file regarding the Boat Loan, including the existence of the financial statement purportedly tendered by, or on behalf of, the Defendant[9] in his efforts to obtain the Boat Loan.[10]

31.  Based upon his knowledge of the loan approval process that has occurred within the Bank *since* his employment, Mr. Neuhoff posits that the Bank staff *would have* required such a financial statement, along with credit reports and other financial data.

32.  He further stated that the Bank's reliance upon the purported financial statement that he found in the Bank's file "would be my assumption."

---

[8]  A witness who is not an expert witness is permitted to testify only from his personal knowledge. FED. R. EVID. 602.  "Generally, a declarant is competent to testify when his testimony is grounded in observation or other personal experience and is not based on speculation, intuition, or rumors about matters remote from that personal experience." *D.B. By & Through Becton v. City of McKinney, Texas*, 2017 WL 6421261, at *2 (E.D. Tex. Dec. 18, 2017) (citing *Visser v. Packer Eng'g Associates, Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc)).  However, the fact that Mr. Neuhoff was not employed by the Bank in 2006 and thus did not observe nor participate in any aspects of the loan approval process regarding the Boat Loan does not automatically disqualify him from testifying.  The Fifth Circuit has held that a factfinder, in weighing the reliability of the testimony of a bank's designated representative as to what a bank loan committee considered and relied on in approving a person's loans, may take into account in its evaluation the negative impact arising from a witness's absence from the loan approval process as well as any positive attributes that arise from that witness's experience and insights into that general approval process.  In other words, the factfinder ascribes the weight to be given to such lay testimony. *First Nat. Bank of Louisville v. Lustig*, 96 F.3d 1554, 1576 (5th Cir. 1996).

[9]  Ex. 2.

[10]  Mr. Neuhoff also testified about his general review of the Bank's files regarding the Defendant and the extensive documentation regarding the numerous financing transactions which occurred between the parties over a series of years.

33.   He later asserted that, had the Bank's staff at the time known of the purported liability omitted from Exhibit 2, the Bank would not have made the Boat Loan.

34.   However, notwithstanding his knowledge about the Bank's approach to loan approvals in subsequent periods of time, without personal knowledge of the occurrences arising in June and July 2006 during the consideration and approval of the Boat Loan, particularly at a time in which the Defendant was considered as a successful client of the Bank who timely met his obligations, Mr. Neuhoff's testimony regarding the Bank's reliance is not credible and could fairly be characterized as sheer speculation.

35.   There are serious doubts about the legitimacy of the June 2006 financial statement purportedly tendered by the Defendant.

36.   Mr. Neuhoff admitted on cross-examination that the June 2006 financial statement is not an original document, but actually a photocopy of a January 2006 financial statement[11] appearing in the Bank's files which the Bank contends was tendered by the Defendant — an allegation that the Defendant denies.

37.   The June 2006 financial statement is on a Benchmark Bank form.

38.   The June 2006 financial statement is unsigned.

39.   The unsigned nature of the statement is of particular importance because the Bank's form prompts the tendering party to sign as a verification of certain conditions and to validate a number of representations pertaining to the accuracy of the document including validations that:

    a.   it is the submitting party's personal financial statement;
    b.   it is submitted for the purpose of inducing the Bank to extend/maintain credit;
    c.   it presents a true, complete, and correct statement of financial condition *as of the date shown* (which it does not);
    d.   it does not omit any pertinent information;
    e.   the submitting party will inform the Bank of any material unfavorable change in the reflected financial condition; and
    f.   authorizes the Bank to seek and obtain validation of the submitted

---

[11]   Ex. 1.

information from credit reporting agencies and other sources.

40.    Mr. Neuhoff admitted that there are times in a loan approval process in which the failure to obtain requisite representations or information through a signature upon a financial statement might be waived or disregarded, even with regard to a "unique" financial transaction, because of the identity of the particular borrower.

41.    The June 2006 financial statement is undated.

42.    The entire section of the June 2006 financial statement designed to disclose detailed information regarding the amounts generically shown on the balance sheet are completely blank.

43.    Further, the June 2006 financial statement is in a significantly different format from the other financial statements tendered by the Defendant or his agents with regard to other financial transactions with the Bank.[12]

44.    The June 2006 financial statement is handwritten and its contents, including the tangential written notes appearing upon it, are of unknown origin.

45.    Though Mr. Neuhoff speculates that the Bank's staff and loan committee in 2006 would have scrutinized the financial statement in its internal credit analysis and unwaveringly relied upon its accuracy in determining whether the Bank would make yet another loan to the Defendant, such "scrutiny" failed to detect that it was relying upon a financial statement that was unsigned, undated, and unverified as to the various representations required by the Bank upon its own form.

46.    Despite such deficiencies, there is no credible evidence that the Bank ever sought any additional information from the Defendant in regard to the approval of the Boat Loan.

47.    Indeed, there is no credible evidence in the record that the Bank ever sought any information directly from the Defendant in regard to the approval of the Boat Loan at all other than the information tendered by the Defendant at the direction of his loan officer, Mr. Bean.

48.    When viewed in its entirety, it is more likely that the Bank agreed to fund the Boat

---

[12] *See, e.g.*, Ex. 3 and 4.

Loan to the Defendant in 2006 based upon its reliance— not on the purported financial statement— but rather upon the Defendant's consistent, successful record of performance in satisfying (to that point in time) his financial obligations to the Bank.[13]

49.  The Bank has failed to demonstrate by a preponderance of the evidence that the Bank required the Defendant to tender a financial statement to the Bank in order to procure the Boat Loan.

50.  The Bank has failed to demonstrate by a preponderance of the evidence that the Defendant made a written representation to the Bank in June 2006 regarding his financial condition in order to procure the Boat Loan.

51.  The Bank has failed to demonstrate by a preponderance of the evidence that the June 2006 financial statement in the Bank's possession was written by, or caused to be prepared by, the Defendant in order to procure the Boat Loan from the Bank.

52.  The Bank has failed to demonstrate by a preponderance of the evidence that the June 2006 financial statement in the Bank's possession was signed or otherwise adopted or used by the Defendant in order to procure the Boat Loan from the Bank.

53.  The Bank has failed to demonstrate by a preponderance of the evidence that the June 2006 financial statement was published by the Defendant.

54.  The Bank has failed to demonstrate by a preponderance of the evidence that the Defendant solicited or adopted the use of any earlier financial statement in order to procure the Boat Loan from the Bank.

55.  The Bank has failed to demonstrate by a preponderance of the evidence that the June 2006 financial statement in the Bank's possession was a contributory cause of its approval of the Boat Loan to the Defendant.

56.  The Bank has failed to demonstrate by a preponderance of the evidence that, but for the June 2006 financial statement in the Bank's possession, the Boat Loan to the Defendant would not have been approved.

---

[13]  Indeed the evidence demonstrates that the Defendant's successful performance of his financial obligations to the Bank continued for two to three years beyond the date of the inception of the indebtedness at issue in this case.

57.     The Bank has failed to demonstrate by a preponderance of the evidence that it actually relied on the information contained in the June 2006 financial statement in granting its approval of the Boat Loan to the Defendant.

58.     The Bank has failed to demonstrate by a preponderance of the evidence that it reasonably relied on the information contained in the June 2006 financial statement in granting its approval of the Boat Loan to the Defendant.

59.     Without the existence of actual reliance, there can be no reasonable reliance. *Columbo Bank v. Sharp (In re Sharp)*, 340 F. App'x. 899, 908 (4th Cir. 2009) (citing *Field v. Mans*, 516 U.S. 59, 68 (1995)).

60.     The Bank has failed to demonstrate by a preponderance of the evidence that the Defendant tendered a false financial statement to the Bank with an intent to deceive.

61.     To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.


### *CONCLUSIONS OF LAW*

1.      The Court has jurisdiction to consider the adversary complaint in this proceeding pursuant to 28 U.S.C. § 1334 and § 157.

2.      This Court has authority to enter a final judgment in this adversary proceeding, as it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A) and (J) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3.      In seeking to except the debt owed to them from the scope of the Debtor-Defendant's discharge, the Bank assumes the burden of proof under a preponderance of the evidence standard.  *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

4.      All exceptions to discharge under §523 "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be

afforded a fresh start."[14]  *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).

5.    The Bank's Complaint seeks a determination that the debt owed to it under the Federal Court Judgment should be excepted from discharge under §523(a)(2)(B) as a debt obtained by a false financial statement.

6.    Specifically, in order to render a debt nondischargeable under the provisions of 11 U.S.C. § 523(a)(2)(B),[15] a plaintiff must demonstrate the following by a preponderance of the evidence:

> (1)  that the debtor made a written representation regarding his financial condition;
> (2)  that the written representation regarding his financial condition was materially false;
> (3)  that the creditor reasonably relied upon the materially false written representation; and
> (4)  that the materially false written representation was published by the debtor with the intent of deceiving the creditor.

7.    The existence of each of these four elements is a question of fact.  *Norris v. First Nat'l Bank (In re Norris)*, 70 F.3d 27, 29 (5th Cir. 1995).

8.    Section 523(a)(2)(B) does not apply to oral statements, only to those actually reduced to writing and produced by the debtor to the creditor.  *Schneiderman v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 111 (2d Cir. 2002).

---

[14]  However, a fresh start is not promised to all who file for bankruptcy relief, but only to "the honest but unfortunate debtor."  *Grogan*, 498 U.S. at 286-87.

[15]  Bankruptcy Code § 523(a)(2)B) specifically provides that:

> A discharge under section 727. . .of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> use of a statement in writing–
> > (i) that is materially false;
> > (ii) respecting the debtor's or an insider's financial condition;
> > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> > (iv) that the debtor caused to be made or published with intent to deceive.

9.  A financial statement need not be signed by the debtor in order to satisfy the threshold element of the requirement of a writing; however, it must be shown that the allegedly false written statement is properly attributable to the debtor.

10. "The writing requirement is satisfied if the written statement was signed, adopted and used, or caused to be prepared by, the debtor." *Fairfax State Sav. Bank v. McCleary (In re McCleary)*, 284 B.R. 876, 885 (Bankr. N.D. Iowa 2002).

*Materially False Statement*

11. "A materially false statement is one that paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.*" Renasant Bank v. Goodin (In re Goodin)*, 2016 WL 5874969, at *5 (Bankr. N.D. Miss. Oct. 7, 2016) (quoting *Jordan v. Southeast National Bank (In re Jordan)*, 927 F.2d 221, 224 (5th Cir. 1991) *(overruled in part by Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257 (5th Cir. 1993) (en banc)).

12. A document qualifies as materially false if it contains information causing it to be substantially inaccurate or omits relevant information. *Heritage Bank v. McCracken (In re McCracken)*, 586 B.R. 247, 256 (Bankr. S.D. Tex. 2018) (citing *Byers v. Slonaker (In re Slonaker)*, 269 B.R. 595, 602-03 (Bankr. N.D. Tex. 2001)).

13. Subjectively, the relevant inquiry "is whether the complaining creditor would have extended credit had it been apprised of the debtor's true situation." *McCleary*, 284 B.R. at 885.

*Financial Condition*

14. To be actionable under § 523(a)(2)(B), the written statement used to obtain credit must relate to the debtor's financial condition. 11 U.S.C. §523(a)(2)(B)(ii).

15. Until recently, the term "financial condition" in this circuit meant "the general overall financial condition of an entity or individual, that is, the overall value of property and income as compared to debt and liabilities." *Bandi v. Becnel (In re Bandi)*, 683 F.3d 671, 676 (5th Cir. 2012). However, the United States Supreme Court has recently rejected that interpretation as too restrictive.

16. In a near-unanimous decision in *Lamar, Archer & Cofrin, L.P. v. Appling*, ___

U.S.___, 138 S.Ct. 1752 (2018), the Supreme Court held that "a statement about a single asset can be a statement respecting the debtor's financial condition under § 523(a)(2)(B) of the Bankruptcy Code." *Id.* at 1764.

17.   In so doing, the Supreme Court rejected the standard that a "statement respecting the debtor's financial condition" was limited only to a statement that captures the debtor's overall financial status because such an interpretation reads the term "respecting" out of the statute. *Id.* at 1761.

18.   "Had Congress intended § 523(a)(2)(B) to encompass only statements expressing the balance of a debtor's assets and liabilities, there are several ways in which it could have so specified. . . .  But Congress did not use such narrow language." *Id.*

19.   "A statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status.  A single asset has a direct relation to and impact aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not.  Naturally, then, a statement about a single asset can be a 'statement respecting the debtor's financial condition.'" *Id.*

*Reliance*

20.   The reasonable reliance element stands as the second of two phrases within § 523(a)(2)(B) which "may be said to constitute causation requirements." *Wolf v. Campbell (In re Campbell)*, 159 F.3d 963, 966 (6th Cir. 1998).[16]

21.   "To meet the reasonable reliance requirement, a creditor must establish two separate, but related, elements: first, that it actually relied on the alleged false statements; and second, that its reliance was reasonable." *Krieger Craftsmen, Inc. v. Ostosh (In re Ostosh)*, 589 B.R. 319, 341 (Bankr. W.D. Mich. 2018) (internal quotations omitted); *see also*, *Maxwell v. Oregon (In re Maxwell)*, 2019 WL 2266395, at *5 (B.A.P. 9th Cir. Mar. 27, 2019) ["Under § 523(a)(2)(B), the creditor's reliance must be both actual and reasonable."].

22.   Without the existence of actual reliance, there can be no reasonable reliance. *Columbo Bank v. Sharp (In re Sharp)*, 340 F. App'x. 899, 908 (4th Cir. 2009), (citing *Field v. Mans*, 516 U.S. 59, 68 (1995)).

---

[16]  The first causation phrase identified by the Sixth Circuit is the statutory requirement that "the debt is nondischargeable only to the extent it was obtained by the written false statement." *Campbell*, 159 F.3d at 966.

23.   "For a creditor to demonstrate 'reasonable reliance' under § 523(a)(2)(B)(iii), it must show reliance in fact, *i.e*., that it actually relied on the financial information, and that such reliance was reasonable."  *GDO Investments, Inc. v. Glascow (In re Glasgow)*, 370 B.R. 362, 372 (Bankr. D. Colo. 2007)

24.   "To establish actual reliance, the creditor must [only] show its reliance on the false financial statement was a contributory cause of the extension of credit and that credit would not have been granted if the lender had received accurate information."  *Gooden*, 2016 WL 5874969 at *7 (citing *Colo. E. Bank & Trust v. McCarthy (In re McCarthy)*, 421 B.R. 550, 560-61 (Bankr. D. Colo. 2009) (internal quotations omitted)).

25.   "Although actual reliance must be demonstrated, a creditor does not have to show that it relied exclusively on the false financial statement.  It is sufficient if the creditor establishes that it partially relied on the false statement."  *Id.  See also*, *Hurston v. Anzo (In re Anzo)*, 562 B.R. 819, 829 (Bankr. N.D. Ga. 2016) ["A financial statement does not have to be the only factor influencing a creditor; partial reliance is all that is needed."].

26.   The Fifth Circuit has held that the reasonableness of a creditor's reliance under § 523(a)(2)(B) is a factual determination to be made in light of the totality of the circumstances.  *Coston,* 991 F.2d at 259.

27.   Among the factors to be evaluated in determining the existence of reasonable reliance in a  § 523(a)(2)(B) context are:

   (1)  whether there had been previous business dealings with the debtor that gave rise to a relationship of trust;
   (2)  whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and
   (3)  whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.
   *Id.* at 261.

*Published with Intent to Deceive*

28.   With regards to the first prong of § 523(a)(2)(B)(iv), the language of the statute unambiguously states that the debtor must cause the false financial statement to be made or published. See § 523(a)(2)(B)(iv).

**-13-**

29.   Secondly, § 523(a)(2)(B)(iv) also requires that any such published statement must be shown to have been tendered by the debtor with an intent to deceive the creditor.

30.   As with most cases involving false statements, direct evidence of an individual's intent to deceive is hard to obtain.  Thus, a court may infer an intent to deceive in a § 523(a)(2)(B) context from the totality of the circumstances.  *Young v. Nat'l Union Fire Ins. Co. (In re Young)*, 995 F.2d 547, 549 (5th Cir.1993).

31.   However, "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce such an inference." *Morrison v. Western Builders of Amarillo, Inc.* (*In re Morrison),* 555 F.3d 473, 482 (5th Cir. 2009) (internal quotations omitted) (citing *Norris,* 70 F.3d at 30, n.12).

32.   The bankruptcy court may consider such factors as the debtor's knowledge of experience in financial matters, as well as whether the debtor exhibited a clear pattern of purposeful conduct when inferring the deceitful intent of a debtor. *Western Builders of Amarillo, Inc. v. Morrison (In re Morrison)*, 361 B.R. 107, 124 (Bankr. W.D. Tex. 2007), *aff'd,* 555 F.3d 473 (5th Cir. 2009).

33.   Once a creditor establishes a debtor had actual knowledge of the false statement, the debtor cannot overcome the inference of the intent to deceive with unsupported assertions of honest intent.  *McCracken*, 586 B.R. at 259.

34.   To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

35.   Based upon the failure of the Plaintiff, Benchmark Bank, to prove by a preponderance of the evidence all elements required to establish its cause of action under 11 U.S.C. § 523(a)(2)(B), the relief sought by the Plaintiff's Complaint must be denied and judgment must be rendered for the Debtor-Defendant, William Gary Stapleton, in this action.

36.   An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 07/26/2019

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

-14-